372 F.Supp. 319 (1974)
UNITED STATES of America, Plaintiff,
v.
CITY OF BLACK JACK, MISSOURI, a municipal corporation, Defendant.
No. 71 C 372 (1).
United States District Court, E. D. Missouri, E. D.
March 20, 1974.
*320 Donald J. Stohr, U. S. Atty., Terry I. Adelman, Asst. U. S. Atty., St. Louis, *321 Mo., J. Stanley Pottinger, Asst. Atty. Gen., Civil Rights Div., Norman P. Goldberg and Carolyn A. Reed, Attys., Housing Section, Civil Rights Div., Dept. of Justice, Washington, D. C., for plaintiff.
Bruce S. Feldacker, St. Louis, Mo., Jewish Community Relations Council, amicus curiae for plaintiff.
Roy W. Bergmann, Sheldon K. Stock, Clayton, Mo., for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
MEREDITH, Chief Judge.
In this action the United States has alleged that the City of Black Jack, Missouri, has engaged in racially discriminatory housing practices in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq., by exercising its zoning powers to exclude Park View Heights, a federally-subsidized housing development for low to moderate income persons. The United States claims that racial discrimination was a significant element in the defendant's purpose. The Court makes the following findings of fact and conclusions of law.

Findings of Fact
1. In 1970 the Black Jack area was unincorporated, and all municipal type of authority was exercised by St. Louis County through its Planning Commission and other departments and the St. Louis County Council.
2. Of the 1,700 acres which were later to become the City, 498.3 acres were built upon and in use, and 1,218 acres were vacant. The vacant acres included undeveloped platted tracts in existing subdivisions, flood plain, and unsubdivided land. Of the land on which buildings were in existence, 15.2 acres were built up with 321 apartments, and 855 single-family dwelling units were on the balance of the developed acreage. The 15.2 acres of apartments were included in a total of 67 acres which had been zoned multiple by the County's 1965 Master Plan. The number of apartments built on the 15.2 acres comprised 27% of all the dwelling units, and 40% of the dwelling units built in the previous fifteen years, in what was later to be the city. If the entire 67 acres, which the County had zoned for multiple dwelling purposes, had been developed for apartments, with the same density per acre as on the 15.2 acres already built up, it would have resulted in 1,412 apartment units. Added to the 3,723 single-family residences that could be built on the remaining city acreage, an estimated density of population per acre of 9.45 would result. The County average per (built up) acre was 7.2. The estimated number of occupants of apartments was taken to be 2.5, while the number of occupants of single-family residences was from 3.5 to 3.75. The "Flood Plain" zone, adjacent to Cold Water Creek, is required by the periodic backing up of the Missouri River, making some of the land useless, except for parks and like uses.
3. The average cost of homes in what was to be the City of Black Jack was approximately $30,000.
4. The average income of Black Jack families is approximately $15,000 annually.
5. In 1967, the Inter Religious Center for Urban Affairs (ICUA) was organized by a group of religious institutions to seek constructive solutions to social and urban problems in the St. Louis area. In the fall of 1969, after several ventures in which ICUA had assisted groups seeking to improve housing in all-black areas, Jack Quigley and Paul Mittelstadt, who organized ICUA's housing program, determined that there was a need to create for persons of low and moderate income living in the ghetto areas of St. Louis City alternative housing opportunities in the predominantly white suburbs of St. Louis County. The proposed Park View Heights (PVH) development, which is the subject of this litigation, was designed for this purpose.
6. In late 1969, ICUA began an analysis of available land in order to select the most appropriate site for the proposed development. Mr. Mittelstadt *322 viewed and considered a number of parcels of land in North County, including one immediately adjacent to St. Mark's Methodist Church (St. Mark's), one of the co-sponsors of the project with the United Metro Ministry, and favored by board members of that church, but which turned out to have an inappropriate zoning classification. Eventually, the ICUA representatives selected an 11.9 acre site at the intersection of Old Jamestown and Parker Roads, in a part of St. Louis County which was then unincorporated, but which is now within limits of the City of Black Jack.
7. On December 23, 1969, the ICUA paid $5,000 in earnest money for an option to the property at a price of $240,000 or $20,000 per acre.
8. Title to the land was to vest in the Park View Heights Corporation, a not-for-profit corporation which was created by the sponsors to become the developer-mortgagor of the Park View Heights development. A Board of Directors, which included six black members and six white members, was elected by the Boards of Directors of St. Mark's and Metro Ministry. Subsequently, Methodist Bishop Eugene Frank also became a sponsor and selected three additional members to the Board.
9. On March 6, 1970, the Park View Heights sponsors filed a preliminary application with FHA for initial approval of a proposed § 236 development at the corner of Parker Road and Old Jamestown Road. According to the Form 2013 submitted by the sponsors, the initial development was to include 108 two-story townhouse units with a wood frame and brick construction. The breakdown of the units by size and rent (including utilities) was as follows:

 No. of Units Basic Rent
 ------------ ----------
 1-bedroom 8 $ 118
 2-bedroom 54 135
 3-bedroom 42 146
 4-bedroom 4 157

10. The architectural firm of Anselevicius and Rupe and the construction firm of Monsey-Feagher Engineers and Constructors, Ltd., were selected to design and build the development.
11. While these developments were occurring, a controversial housing development (Summerhill) was creating lively discussion in the Black Jack area. Summerhill was a request to St. Louis County by the Alfred H. Mayer Company on February 10, 1970, for a Planned Environmental Unit Special Procedure Permit for 600 homes (to be expanded to 1,000) to be built on 161.8 acres fronting on Old Jamestown Road, involving rezoning downward of the acreage from 15,000 to approximately 5,000 square feet per lot. It was vigorously, but unsuccessfully, opposed by Black Jack people; however, the project was never built. Summerhill was planned as single-family residential, but in the lower income spectrum, involving 600 to 1,000 dwelling units. In the price range as advertised ($16,000), the people of the area felt it would have devalued present property values and increased population density disproportionately to the rest of the community.
12. About 4,500 "handouts" entitled "Are you Aware?" were mailed to the citizens of the area in opposition to Summerhill.
13. Meetings of the Black Jack Improvement Association (BJIA) were stimulated by the pendency in the St. Louis County Planning Commission and the St. Louis County Council of the petition for "Summerhill". At a meeting of the BJIA on March 10, 1970, three things were considered: (1) opposition to Summerhill; (2) incorporation as a City of Black Jack to "give a handle on local government"; and (3) investigation of a rumored, unnamed federally-subsidized apartment complex (Park View Heights).
14. In late March or early April 1970, the proposal to build an FHA-236 development in Black Jack became a matter of public knowledge. Opposition to the development, organized and led by the BJIA, Spanish Lake Improvement Association (SLIA), and County Councilman *323 Milton Bischof, developed almost immediately. A pamphlet was sent to area residents by the BJIA that was based on partially incorrect information and announced an April 8th meeting, which was held at a school in neighboring Spanish Lake. Residents seeking to learn more about Park View Heights received some inconsistent reports in the spring of 1970 from the sponsors, from public officials, and from adversaries of the development about the nature of the development and the income level of the group to be served. Some of these inconsistencies were cleared away before the zoning ordinance was passed. In recognition of the misapprehensions and opposition on the part of some area residents, representatives of the sponsors accepted invitations to speak at a number of community meetings about the proposed housing development. Representatives of the architectural firm attended some of the meetings and showed slides depicting what the project would look like. A detailed letter explaining PVH was also prepared by the sponsors and mailed to thousands of area residents in an effort to correct any misinformation about the development. Nevertheless, between misinformation and not knowing who to believe, confusion, distortions, and distrust of the nature of Park View Heights continued. Incorporation had come up often before in Black Jack when annexation was threatened or when other nearby areas incorporated. There was also a dissatisfaction in the area with St. Louis County government, and a history of opposition to apartments, and these feelings were heightened by proposals such as Summerhill and Park View Heights.
15. The sponsors filed their application for a feasibility letter which was issued on June 5, 1970. As stated in Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208, at 1211 (8th Cir. 1972):
"Upon learning of the `feasibility letter,' area residents began a drive to incorporate the area including the site of the proposed Park View Heights apartments. On June 26, 1970, the Citizens for the Incorporation of Black Jack presented two petitions requesting incorporation with 1,425 signatures to the St. Louis County Council. Between June 26, 1970, and August 6, 1970, the St. Louis County Department of Planning reported to the St. Louis County Council that they `strongly opposed the act of incorporation on fiscal, planning, and legal grounds.' Despite this opposition, the St. Louis County Council incorporated the City of Black Jack, Missouri, on August 6, 1970."
16. The reasons for incorporation given by the incorporators were to establish Black Jack's own independent local government and to regulate Black Jack's own zoning. Dr. Schuchardt, chairman of the zoning commission and a community leader, gave the reasons as follows:
1. Desire for local government.
2. Feeling County Government had ignored the people's wishes on Summerhill.
3. In this case the Federal Government also ignored the people's wishes on Park View Heights (but the incorporation effort was going on before that, so it was really dissatisfaction with the county over a period of time).
4. Problems with the police.
5. The county's plan to reroute Old Halls Ferry Road.
6. Zoning.
17. The incorporators also submitted a list of officers, pursuant to Missouri statute, suggesting the appointment of the officers of the newly incorporated city of Black Jack until the next election, which list contained the names of eight suggested councilmen.
18. However, the County Council appointed only four of the eight submitted by the incorporators, adding four of the County Council's own selection to make the total of eight councilmen requested. *324 Those appointed by the County Council from its own selection were:
1. Harold Evangelista
2. Alden Williams
3. Herb Bangert
4. G. Joe Schulte
Those appointed by the County Council from the eight suggested by the incorporators were:
5. Joan (Mrs. William) Kessler
6. Albert N. Schroeder
7. James Connolley
8. Mrs. Noah Epley
19. As stated in Park View Heights Corp. v. City of Black Jack, supra, at 1211:
"On August 13, 1970, Park View Heights Corporation was formed by St. Mark's, Metro Ministry, and Bishop Eugene M. Frank, the Office of the Missouri Bishop of the United Methodist Church, since July 1970, a joint sponsor of the Park View Apartments. On September 8, 1970, Park View Heights Corporation assumed title to the proposed site as an assignee of ICUA.

"Between the date of the municipal incorporation and September 15, 1970, the municipal authority of the City of Black Jack was suspended by a Writ of Prohibition issued by a state court. Within six days after the writ was dissolved, the city Zoning Commission issued notices of hearings on a zoning ordinance which would effectively prevent the construction of new multi-family dwelling units within the City of Black Jack."
20. The zoning commission of Black Jack was made up of two women, two blacks, some engineers, and a businessman, among others, being twelve in number: Henke, Schmiedler, Hutton, Thomas, Sewing, Hunter, Hoyt, Volentine, Bresler, Begeman, Ulrich, and Schuchardt. Schuchardt was elected by the commission as its chairman after its appointment.
21. When the Council appointed the zoning commission, all of the councilmen submitted names of likely prospects and then the eight councilmen formed teams of two to interview the persons whose names had been submitted. One member of a two-man team was a councilman who had been selected by the County Council against the suggestion of the incorporation committee, while the other member was a councilman who had been selected by the County Council from among the names the incorporation committee submitted to them.
22. The zoning commission had six meetings and two public hearings, and submitted a preliminary report on September 23, 1970, to the public, and a final report with a draft of what was to be City Ordinance No. 12, on September 29, 1970. The meetings lasted three hours on the average, and opposition to the proposed zoning ordinance was expressed by some people, including Mr. Vorhof of Whitney Chase and Mr. Williams of Park View Heights Corporation.
23. The zoning commission was unanimous in its vote in favor of the zoning ordinance, which excluded all new multiple-family dwellings, and made present ones non-conforming uses. The Zoning Ordinance No. 12 was passed on October 20, 1970. Dr. Schuchardt summarized the principal characteristics of the recommendations of the zoning commission and the zoning ordinance submitted with it as intended to preserve the single-family use of land in the community. He understood that poor people would be less able to afford a home in Black Jack. He understood that the zoning commission was putting an "economic floor" under construction of future residences in Black Jack. It should be noted that the two black men on the zoning commission also voted in favor of this ordinance, because they opposed apartments.
24. When examined by plaintiff with respect to the underlying reasons for their opposition to apartments and to *325 Park View Heights, substantially all of the zoning commissioners and other defense witnesses cited one or more of the following three objections to apartments:
a. They would burden the roads, increase traffic, or both;
b. They would add to overcrowding of the schools; and
c. They would devalue adjacent single-family houses.
There were some other reasons advanced, but these were the most often repeated. Testimony and evidence was presented attempting to refute these reasons or to show them to be invalid.
There was also testimony presented concerning racial discrimination. Much of the testimony was irrelevant as to the City of Black Jack and its zoning ordinance. It was sufficient, however, to show that race was a consideration of at least a few of the people in Black Jack, and one of the zoning commissioners was personally prejudiced. A former mayor testified that in his opinion race was one factor, albeit "very insignificant" and only in some people.
25. Statistical information submitted shows that at the relevant time the area which is now the City of Black Jack was virtually all white, with a black population of between 1% and 2%. The area of St. Louis County north of Interstate Highway 270, which includes Black Jack, is approximately 99% white. In 1970, the Hazelwood School District, of which Black Jack is a part, had a total of 24,256 students, of whom only 250, or almost exactly 1%, were black.
26. The virtually all-white character of Black Jack was in marked contrast to the racial composition of other parts of the St. Louis area. In 1970, the pupil population of the City of St. Louis School District was 65.6% black. The few blacks in north St. Louis County tended to live in racial pockets. In 1970, the Kinloch School District, which is only two miles from the nearest boundary of the Hazelwood School District, had 1,245 students, all of whom were black.
27. The percentage of blacks in St. Louis County has increased only slightly overall from 4.1% in 1950 to 4.8% in 1970. During the same period, the percentage of blacks in the City of St. Louis more than doubled from 17.9% to 40.9%.
28. Between 1950 and 1970, the population of the city declined from 856,796 to 622,236, a decrease of 27%, while the population of the county more than doubled from 406,349 to 951,353. From 1960 to 1970, there were approximately 102,298 new housing starts in the county, and 15,348 in the city, a ratio of almost 7 to 1. During the same period, the city had a net decrease of 24,548 housing units, while the county had a net increase of 84,169. With regard to employment opportunity, the following table reflects the number of persons employed in the city and county in 1950, 1960, and 1970:

 St. Louis St. Louis
 City County 
1950 366,524 156,526
1960 294,000 263,200
1970 231,765 384,409
Increase or Loss
1950-1970 -134,759 +227,883

29. The concentration of blacks in the city and in pockets in the county is accompanied by the confinement of a disproportionate number of them in overcrowded or substandard accommodations. The 1970 census reveals that in St. Louis city and county approximately 40% of the black families, as compared with 14% of the white families, lived in over-crowded units. However, the relevancy of these statistics is questionable since Park View Heights will only accommodate low and moderate income families and many of these will not be helped.
Other statistics submitted showed 79% blacks and 51% whites earned less than $10,000 in the St. Louis metropolitan area [which for these purposes is the standard metropolitan statistical *326 area (SMSA), including St. Louis City and County, St. Charles County, Jefferson County, and Franklin County, in Missouri, and Madison and St. Clair Counties in Illinois].
In the SMSA, 32% of the black families and 29% of the white families make between $5,000 to $10,000, which, according to defendant's statistics, makes racial composition of this group 85% white and 15% black, very close to the 86% white and 14% black composition of the SMSA. Fifty-eight percent of the blacks in the above category $5,000 to $10,000 rent, while 39% of the whites in this category rent their homes.
This Court has liberally cited from these presented statistics, although many are irrelevant to this case, as will be explained later.
30. In its pretrial brief and during discovery, the United States proposed to introduce extensive evidence to show that the residential racial composition in housing described in the foreging findings was in large measure the result of deliberate racial discrimination in the housing market by the real estate industry and by agencies of the federal, state, and local governments. Early in the trial, the parties stipulated that this was true, thereby obviating the necessity for extensive proof on this issue.
The income range relevant to this lawsuit, however, is that of $5,528 to $10,143, as set out in this Court's order of February 23, 1973, since this is the income range for Park View Heights, with a $300 per child and 5% social security deduction allowed.
31. The City of Black Jack has, on the face of the evidence presented, been a financial success in terms of service, taxation, and fiscal affairs.
32. HUD Secretary Romney had, in May 1970, unsuccessfully asked Congress to exclude federally-assisted housing from the operation of local zoning ordinances by letter to the Honorable Wright Patman, Representative, dated May 27, 1970, transmitting draft of proposed legislation entitled "Local Exclusion of Federally Assisted Housing". To date, Congress has not seen fit to grant HUD an exemption from local zoning ordinances as would have been granted by this proposed legislation.
33. The present action was instituted in June 1971, the Government claiming that the zoning ordinance of the City of Black Jack had the effect of making desegregation much more difficult, and violated the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq.

Conclusions of Law
1. This Court has general jurisdiction of this action under 28 U.S.C. §§ 1345 and 2201 and 42 U.S.C. § 3613, and has personal jurisdiction over the defendant.
2. In this case on March 30, 1972, this Court, in denying defendant's motion to dismiss this action and several additional motions, held, among other things:
a. That the complaint properly alleged racial discrimination, as distinguished from economic discrimination, even though Black Jack's Zoning Ordinance excluded all apartments and made no reference to race and even though there were no existing apartments from which blacks were alleged to have been excluded;
b. That the City of Black Jack is amenable to suit under 42 U.S.C. § 3613; and
c. That there was no reason for this Court to abstain from taking jurisdiction.
In Park View Heights v. City of Black Jack, 335 F.Supp. 899 (E.D.Mo.1971), the companion case to this action, the Court dismissed most of the allegations of the complaint on the grounds that the controversy was not ripe for adjudication, because plaintiffs had not asked for a building permit, and because several plaintiffs lacked standing. In Park View Heights v. City of Black Jack, 467 F.2d 1208 (8th Cir. 1972), the Court of Appeals reversed, holding that the controversy was ripe for adjudication. The *327 Court of Appeals held that Black Jack's zoning ordinance forbids all apartments, including Park View Heights, and that "it would be futile to require the plaintiffs to proceed further at the local level." The Court of Appeals further held that by alleging a statistical pattern of racial discrimination almost identical to the proof adduced by the United States in this case, the individual plaintiffs
". . . have presented a strong case for consideration at this time. They allege that they are subject to the serious consequences of segregation in housing and education, as well as the economic consequences of decreasing access to jobs due to their inability to escape from the inner city." 467 F.2d 1216.
Accordingly, this Court concludes that any argument by defendant that Park View Heights did not exhaust its remedies is foreclosed by the judgment of the Court of Appeals in Park View Heights v. City of Black Jack, supra.
3. The Congressional intent in enacting Title VIII of the Civil Rights Act of 1968 is stated in 42 U.S.C. § 3601 as follows:
"It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."
4. In addition to prohibiting discriminatory refusals to rent or to negotiate rental, 42 U.S.C. § 3604(a) also makes it unlawful to "otherwise make unavailable" a dwelling, or to "deny" a dwelling, on account of race. The foregoing phraseology appears to be as broad as Congress could have made it. United States v. City of Parma, Ohio, 374 F.Supp. 730, Battisti, C. J. (D.C. 1973). "Dwelling" is defined in 42 U. S.C. § 3602(b) as including "any vacant land which is offered for sale or lease for the construction or location thereon" of residential property. Accordingly, where a municipality exercises its zoning powers in a racially discriminatory manner and thereby excludes housing which provides rental opportunities for significant numbers of non-white persons, such conduct constitutes a violation of 42 U.S.C. § 3604(a). Park View Heights v. City of Black Jack, supra; Kennedy Park Homes v. City of Lackawanna, 318 F.Supp. 669, 694 (W.D.N.Y. 1970), aff'd 436 F.2d 108 (2d Cir. 1970), cert. den. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971).
5. The city has moved once again to dismiss this action on the grounds that the city is not a "person" that can be sued under 42 U.S.C. § 3613, and citing Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). It is true that the cited cases hold that a city is not a person within the definition of 42 U.S.C. § 1983, and cannot, thus, be sued under that statute, either in law or equity, but that does not hold true under 42 U.S.C. § 3613. A city is within the definition of a person under § 3613, and discussion of and reasons for this conclusion can be found in United States v. City of Parma, Ohio, supra. Stated very briefly, the definition is and was meant to be much broader from the legislative history; the word "include" was used in delineating applicable categories in the statutes, indicating unnamed other categories may also be in the definition; and "corporations" is one of the categories under which a strong argument for the inclusion of cities could be made, since public corporations are not excluded from the definition.
6. The next point to be considered in this suit is whether actions of the City of Black Jack were facially valid, that is, valid if there was no impermissible discrimination.
Incorporation of the city was conducted under 89.010, R.S.Mo.1969, V.A.M.S., and all of the vidence presented indicates that on August 6, 1970, the City of Black Jack was statutorily validly created by the St. Louis County Council. Following the lifting of the court order, the zoning ordinance was validly passed *328 according to statute, on October 20, 1970.
7. The zoning ordinance, in not allowing multi-family residences, raises additional questions with which this Court must deal. The most important of these is whether a single-use zoning ordinance is valid under Missouri law. This issue of single-use zoning (to say Black Jack is single use is not entirely accurate, but for all practical purposes for issues herein presented, it is) has been presented to the Missouri courts, Bosch v. Village of Uplands Park, 494 S.W.2d 339 (Mo.S.Ct.1973); McDermott v. Calverton Park, 454 S.W.2d 577 (Mo. S.Ct. en banc 1970). In these cases the Supreme Court of Missouri upheld single-use zoning as not invalid per se. Although the Court noted that not all single-use zoning would be reasonable, and, thus, upheld, there is a presumption of validity of a zoning ordinance, Flora Realty & Investment Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771 (en banc 1952). The burden is upon the attacker to show the invalidity and the Government has not met that burden in this case.
8. The Government contends that Park View Heights had bought this land in reliance on the zoning, and that Park View Heights is denied due process by the zoning. By wanting to build multi-family housing on property zoned single-family, the Park View Heights Corporation wished to build a non-conforming use. By Missouri law a nonconforming use must be in existence to survive the zoning law, Pearce v. Lorson, 393 S.W.2d 851 (St.L.Ct.App.1965). The fact that land was bought with a non-conforming use in mind at a time when the zoning allowed such use makes no difference. Pearce v. Lorson, supra. This is true even where the land is worth more with the non-conforming use, Pearce v. Lorson, supra; City of St. Paul v. Chicago, St.P., M. & O. Ry. Co., 413 F.2d 762 (8th Cir. 1969). Since the plans for the multi-family dwelling were not even completed until December 1970, and no use was made of the land prior to the single-family zoning by the city, the zoning law is facially valid against Park View Heights, in view of the fact federally subsidized housing is not exempt from the zoning law. Whether the land was zoned multi-family under county law or unzoned on September 8, 1970, is irrelevant.
9. The Court is then faced with the issues that brought this lawsuit to this Court. Were the actions of the City of Black Jack invalid because motivated by racial discrimination, or because of alleged racially-discriminatory purpose and effect? This Court's review of the validity of the zoning ordinance is limited to whether the ordinance is arbitrary, unreasonable or without a rational basis, since the ordinance is legislative in character, City of St. Paul v. Chicago, St.P., M. & O. Ry. Co., supra.
The plaintiff has argued in this case that the showing of any racial sentiment whatsoever, at any level, shows that the purpose of the ordinance was to exclude Park View Heights on account of "race, color, creed or national origin". Some of the cases cited by plaintiff do contain broad language, Crow v. Brown, 332 F. Supp. 382 (N.D.Ga.1971); Banks v. Perk, 341 F.Supp. 1175 (N.D.Ohio 1972). However, the law has not gone so far that a few isolated racial statements by resident voters of a city, with no other proof or relation to an ordinance, will make that ordinance racially motivated.
In this instance, the plaintiff is alleging that the zoning ordinance of the City of Black Jack was motivated by the racial prejudices of its citizens, or had as its purpose or intent discrimination due to race. Evidence of statements, either directly or by insinuation, racial letters, meetings, and phone calls were introduced to prove this. Most of the offered proof consisted of anonymous statements or phone calls, non-resident letters, or letters concerned with other than racial reasons, and meetings outside the city limits of Black Jack, much of which is not probative to the actions of the City of Black Jack. When the *329 Government's evidence of motivation, purpose, or intent is analyzed, racial statements can be attributed to a very insignificant number of Black Jack residents and possibly one zoning commissioner of twelve. It should be noted that the Government also contends that the leaders of this movement warned the people not to mention race. The proof of such was sparse for the result indicated by the evidence, or lack of evidence, of racial expression presented by the plaintiff.
The evidence in this case does not support a charge of racial motivation, purpose, or intent in the incorporation of Black Jack as a city or the passing of Black Jack's zoning ordinance. We are not in this case dealing with only the action of private parties, but with the otherwise valid actions of governing bodies. In testing the validity of an action of the government of a city, county, state, or country against a charge of racial discrimination, it would be ludicrous to contend that the feelings and personal prejudices of every resident or even governmental officer of that government must be examined. Personal feelings or prejudices unexpressed and unmanifested in action would become the test of the validity of governmental action. Although it is true very few officials will openly state racial reasons for their actions, racial considerations must be shown as part of the legislation or as a significant reason for the legislation. It is not enough merely to allege such discrimination.
As applied to Black Jack, the zoning commission consisted of twelve (12) people, including two blacks. The zoning ordinance passed unanimously. The Government contended one of the blacks was a reluctant ordinance supporter, even though the same man was willing to take a position on a different vote that was 10-2 against him. Multiple reasons were advanced for opposition to apartments, among them the character of the community, road congestion, school impaction, property devaluation, and opposition to transient apartment dwellers. The plaintiff attempted to prove all these non-racial reasons erroneous, and often got so far as to get the witness who cited one to admit he had been wrong. However, such fact hardly proves that these reasons did not constitute all or part of the motivation, purpose, or intent in opposing apartments. These are valid state reasons to pass such an ordinance and supply a rational basis for the actions of the City of Black Jack.
The evidence offered by the Government does not show arbitrariness, unreasonableness, discrimination, or lack of a rational basis for the zoning ordinance by Black Jack. The action of the City of Black Jack in passing the zoning ordinance was not due to racial motivation, purpose, or intent.
10. The Government's next major argument is that the effect of this zoning ordinance was to perpetuate racial discrimination in housing because: (1) more blacks than whites would be served by Park View Heights, and (2) Park View Heights would contain a higher percentage of blacks to whites than Black Jack presently does.
11. The Government has supplied this Court with many statistics to prove the effect of the action of Black Jack, most of which are of little to no probative value. From these statistics, the racial composition of the group to be served by PVH is sought to be established, therefore, showing the allegedly racial effect of excluding PVH.
Park View Heights will serve the income range of approximately $5,000 to $10,000. A fortiori, if Park View Heights is built, only that group will be served, and the exclusion of PVH is keeping out only these people. Therefore, statistics such as 85% of the blacks in the SMSA are excluded from Black Jack by economic conditions, or that 79% of the blacks and 51% whites in the SMSA make below $10,000, do not prove discrimination.
The Government has introduced statistics to the effect that 32% of the blacks and 29% of the whites make between $5,000 to $10,000, and *330 58% of the blacks and 39% of the whites in this income range rent their homes. The former statistic is all that is relevant. The latter is not because: (1) it is not illegal to discriminate against apartment dwellers without regard to race, color, creed, or national origin, and this statistic introduces that classification, and (2) more blacks than whites may rent due to past discrimination, rather than choice, but that is not at issue here, and to use a statistic showing that blacks are confined to a certain type of housing in an argument for building that type of housing for them in a different location is contradictory. Thus, the percentage of each race that Park View Heights is designed to serve is very close to the same, and the effect of excluding this class is not racially discriminatory.
12. The remaining argument to show a racially discriminatory effect is that there would be a higher proportion of blacks in Park View Heights than in the City of Black Jack, and its exclusion is, therefore, preventing integration. This argument cannot be sustained.
Plaintiff's statistics show that low to moderate income renters are 78% white and 22% black and that Black Jack is 98% white and 2% black. The plaintiff advances these statistics to show that the introduction of Park View Heights with even a smaller than average black percentage would add to integration in Black Jack, and, thus, the effect of excluding Park View Heights is discriminatory.
However, plaintiff's statistics also show that there is a higher percentage of blacks (27%) of all incomes that rent than of the lower to moderate income range. Since plaintiff's statistics were not compiled from only federally-subsidized multi-family dwellings, and all multi-family dwelling developers and owners must comply with the Fair Housing Laws, then the introduction of any multi-family dwelling to Black Jack would result in more integration in housing. This means that an otherwise valid zoning ordinance could not be upheld when challenged by the Government or any private developer of multi-family dwellings until such time as the "proper" racial mix is achieved. The result would be the exemption not only of federally-subsidized housing from local zoning, a step Congress refused to take, but the exemption of all multi-family dwellings from local zoning controls in disproportionate cities. The valid interests of the citizenry and community in planning would be supplanted by regional, flexible planning disassociated from local government and ignoring the valid desires and needs of the people in the immediate area. This is beyond judicial review of zoning ordinances, and a step this Court will not take.
Plaintiff has failed to make a statistical case of racially discriminatory effect sufficient to overcome these interests, and the zoning ordinance of Black Jack must be upheld. Accordingly, this action will be dismissed.
The defendant's request for attorneys' fees is denied for the same reasons expressed in the memorandum of this Court, dated March 30, 1972, in this action.