**UNITED STATES of America, Appellant-Appellee,**

v.

**CITY OF BLACK JACK, MISSOURI, Appellee-Appellant.**

**Nos. 74–1345 and 74–1378.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1974.

Decided Dec. 27, 1974.

Rehearing and Rehearings En Banc Denied Jan. 20, 1975.

---

Frank E. Schwelb, Atty., Dept. of Justice, Washington, D. C., for appellant-appellee.

Roy W. Bergmann, Clayton, Mo., and Sheldon K. Stock, Clayton, Mo., for appellee-appellant.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

HEANEY, Circuit Judge.

This action was brought by the United States against the City of Black Jack, Missouri, under Title VIII (Fair Housing) of the Civil Rights Act of 1968. 42 U.S.C. § 3601 et seq. The complaint alleged that the City had denied persons housing on the basis of race, in violation of § 3604(a), and had interfered with the exercise of the right to equal housing opportunity, in violation of § 3617, by adopting a zoning ordinance which prohibited the construction of any new multiple-family dwellings. In particular, it alleged that the ordinance operated to

preclude construction of a low to moderate income integrated townhouse development known as Park View Heights.[1]

The District Court recognized that,

* * * where a municipality exercises its zoning powers in a racially discriminatory manner and thereby excludes housing which provides rental opportunities for significant numbers of non-white persons, such conduct constitutes a violation of 42 U.S.C. § 3604(a). * * *

United States v. City of Black Jack, Missouri, 372 F.Supp. 319, 327 (E.D.Mo. 1974).

However, it held that the United States had failed to prove that there was any racially discriminatory effect or that the City had operated with racially discriminatory motives, and that, therefore,

* * * [t]his Court's review of the validity of the zoning ordinance is limited to whether the ordinance is arbitrary, unreasonable or without a rational basis * * *.

*Id.* at 328.

Finding that the ordinance had none of those qualities, the court held that there was no violation of Title VIII and denied relief. We reverse.

The factual background of the litigation is set forth in the District Court's reported opinion. We repeat here those facts relevant to this appeal. In 1970, the Black Jack area was unincorporated and was governed locally by St. Louis County. The county had adopted a master plan in 1965 which embraced the 1,700 acres which were later to become the City of Black Jack. That plan designated sixty-seven acres for multiple-family construction. In 1970, 15.2 of those acres were occupied by 321 apartments, 483.1 acres were occupied by single-family dwellings, and the rest of the land was undeveloped.

In 1969, the Inter Religious Center for Urban Affairs (ICUA) began planning Park View Heights to create alternative housing opportunities for persons of low and moderate income living in the ghetto areas of St. Louis. After a search for an appropriate site, ICUA settled on 11.9 acres on Old Jamestown Road, then in an unincorporated area, but now within the City of Black Jack. The site was designated for multiple-family structures. An option was obtained on the land, and in March, 1970, the sponsors filed a preliminary application with the Federal Housing Administration for initial approval of a proposed § 236 development. The original plans envisioned 108 units comprised of two-story townhouses. Within a month, the proposal became a matter of public knowledge, and public opposition was swift and active.

On June 5, 1970, HUD issued a "feasibility letter," which amounted to a green light for federal funding, and which was accompanied by a reservation of federal funds for the development. As stated in Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208, 1211 (8th Cir. 1972):

Upon learning of the "feasibility letter," area residents began a drive to incorporate the area including the site of the proposed Park View Heights apartments. On June 26, 1970, the Citizens for the Incorporation of Black Jack presented two petitions requesting incorporation with 1,425 signatures to the St. Louis County Council. Between June 26, 1970 and August 6, 1970, the St. Louis County Department of Planning reported to the St. Louis County Council that they "strongly opposed the act of incorporation on fiscal, planning, and legal grounds." Despite this opposition, the St. Louis County Council incorporated the City of Black Jack, Missouri, on August 6, 1970.

* * * * * *

---

1. Similar allegations were made in an earlier unrelated action brought by the developer, a sponsor, and prospective residents of Park View Heights. *See* Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (8th Cir. 1972), reversing 335 F.Supp. 899 (E.D.Mo. 1971).

Between the date of the municipal incorporation and September 15, 1970, the municipal authority of the City of Black Jack was suspended by a Writ of Prohibition issued by a state court. Within six days after the writ was dissolved, the city Zoning Commission issued notices of hearings on a zoning ordinance * * *.

The ordinance was enacted by the City Council on October 20, 1970. It prohibited the construction of any new multiple-family dwellings and made present ones nonconforming uses.

The racial composition of Black Jack and the surrounding area was set forth by the District Court in its opinion, and is not contested by the parties:

Statistical information submitted shows that at the relevant time the area which is now the City of Black Jack was virtually all white, with a black population of between 1% and 2%. The area of St. Louis County north of Interstate Highway 270, which includes Black Jack, is approximately 99% white. * * *

The virtually all-white character of Black Jack was in marked contrast to the racial composition of other parts of the St. Louis area. In 1970, the pupil population of the City of St. Louis School District was 65.6% black. * * In 1970, the Kinloch School District, which is only two miles from the nearest boundary of the Hazelwood School District [of which Black Jack is a part], had 1,245 students, all of whom were black.

The percentage of blacks in St. Louis County has increased only slightly overall from 4.1% in 1950 to 4.8% in 1970. During the same period, the percentage of blacks in the City of St. Louis more than doubled from 17.9% to 40.9%.

Between 1950 and 1970, the population of the city declined * * * [by] 27%, while the population of the county more than doubled * * *. From 1960 to 1970, there were approximately 102,298 new housing starts in the county, and 15,348 in the city, a ratio of almost 7 to 1. During the same period, the city had a net decrease of 24,548 housing units, while the county had a net increase of 84,169. * * *

The concentration of blacks in the city and in pockets in the county is accompanied by the confinement of a disproportionate number of them in overcrowded or substandard accommodations. The 1970 census reveals that in St. Louis city and county approximately 40% of the black families, as compared with 14% of the white families, lived in overcrowded units. * *

United States v. City of Black Jack, Missouri, *supra* 372 F.Supp. at 325.

The District Court further found that the average cost of a home in the City of Black Jack in 1970 was approximately $30,000, and that the average income of Black Jack families is approximately $15,000 per year. It found that Park View Heights was designed to meet the housing needs of families making between $5,528 and $10,143 per year.

█ Two peripheral issues raised by the City on appeal may be summarily disposed of. First, Black Jack asserts that a municipality may not be sued under Title VIII because it is not a "person" within the meaning of §§ 3602 and 3613. It urges that the analogous cases of City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), and Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which dealt with § 1983, are controlling. The District Court properly rejected this claim. Both *Monroe* and *Kenosha* emphasized explicit legislative history peculiar to § 1983. Title VIII, on the other hand, was passed almost one hundred years after the initial enactment of § 1983, and there is no similar legislative history. To hold that local government is immune from the proscriptions of Title VIII * * * turns the old "state action" controversy on its head. * * * It is simply too late in the day now to say that judicial control is impossible for

the very reason that the state is involved. Whatever one thinks of state action as a viable limiting principle on the constitutional command of equality, it should at least be clear that the most outrageous deprivations of equal rights are those perpetrated by the state itself. * * * We are unwilling to believe that the legislators who voted for [Title VIII] intended to exempt the most serious offenses from its coverage.

Mayers v. Ridley, 151 U.S.App.D.C. 45, 465 F.2d 630, 635 (1972) (en banc) (J. Skelly Wright, J., concurring). *See also* Citizens Committee for Faraday Wood v. Lindsay, 362 F.Supp. 651, 653 (S.D.N.Y. 1973).

■ Second, Black Jack asserts that the District Court erroneously refused to abstain, and that the matter was one properly left to the state courts. However,

* * * Congress [has] imposed the duty upon all levels of the federal judiciary to give due respect to a suitor's choice of a federal forum for the hearing and decision of his federal constitutional claims. * * *

Zwickler v. Koota, 389 U.S. 241, 248, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967).

Although this action was brought under a federal statute rather than under the Constitution, the statute was enacted as an aid to enforcement of the Thirteenth Amendment. We see no sound reason upon which to justify denying the plaintiff a federal forum. *See* Kennedy Park Homes Ass'n v. City of Lackawanna, 436 F.2d 108, 112 (2nd Cir. 1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971).

We turn then to the merits of the decision below. Congress has declared that the purpose of the Fair Housing Act of 1968 is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The Act was passed pursuant to congressional power under the Thirteenth Amendment to eliminate the badges and incidents of slavery. In construing the Civil Rights Act of 1866, also

founded on that power, the Supreme Court has declared that

* * * when racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery.

Jones v. Mayer Co., 392 U.S. 409, 442–443, 88 S.Ct. 2186, 2205, 20 L.Ed.2d 1189 (1968).

■ Title VIII is designed to prohibit "all forms of discrimination, sophisticated as well as simple-minded." Williams v. Matthews Co., 499 F.2d 819, 826 (8th Cir. 1974). Just as Congress requires

* * * the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification[,]

Griggs v. Duke Power Co., 401 U.S. 424, 430–431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), such barriers must also give way in the field of housing. The discretion of local zoning officials, recently recognized in Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), must be curbed where "the clear result of such discretion is the segregation of low-income Blacks from all White neighborhoods." Banks v. Perk, 341 F.Supp. 1175, 1180 (N.D. Ohio, 1972), aff'd in part & rev'd in part without opinion, 473 F.2d 910 (6th Cir. 1973).

■ The burden of proof in Title VIII cases is governed by the concept of the "prima facie case." Williams v. Matthews Co., *supra* 499 F.2d at 826. To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. *See id.;* United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799, 808 (5th Cir. 1974); Hawkins v. Town of Shaw, Mississippi, 461 F.2d 1171, 1172 (5th Cir. 1972) (en banc); Kennedy Park Homes Ass'n v.

City of Lackawanna, *supra* 436 F.2d at 114; Dailey v. City of Lawton, Oklahoma, 425 F.2d 1037, 1039 (10th Cir. 1970); Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2nd Cir. 1968). The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing[2] was racially motivated.[3] *See* Williams v. Matthews Co., *supra* 499 F.2d at 826; United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, *supra* 493 F.2d at 808; Kennedy Park Homes Ass'n v. City of Lackawanna, *supra* 436 F.2d at 114; Citizens Committee for Faraday Wood v. Lindsay, *supra* 362 F.Supp. at 658; Banks v. Perk, *supra* 341 F.Supp. at 1180. Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations, but more importantly, because

> \* \* \* [w]hatever our law was once, \* \* \* we now firmly recognize that the arbitrary quality of thoughtless-

ness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme. Hobson v. Hansen, 269 F.Supp. 401, 497 (D.D.C.1967), aff'd sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969) (en banc).

■ Once the plaintiff has established a prima facie case by demonstrating racially discriminatory effect, the burden shifts to the governmental defendant to demonstrate that its conduct was necessary to promote a compelling governmental interest.[4] *See* United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, *supra* 493 F.2d at 809; Gautreaux v. City of Chicago, 480 F.2d 210, 216 (7th Cir. 1973) (Swygert, J., concurring), cert. denied, 414 U.S. 1144, 94 S.Ct. 895, 39 L.Ed.2d 98 (1974); Kennedy Park Homes Ass'n v. City of Lackawanna, *supra* 463 F.2d at 114; Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286, 1288 (5th Cir. 1971), aff'd en banc,

---

**2.** This holding is consistent with cases involving racial discrimination in other areas. *See* Wright v. Council of City of Emporia, 407 U.S. 451, 462, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972) (schools); Griggs v. Duke Power Co., 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (employment); Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (restaurant); Hawkins v. Town of Shaw, Mississippi, 461 F.2d 1171, 1174 (5th Cir. 1972) (en banc) (Wisdom, J., concurring) (municipal services).

**3.** The United States contends that the ordinance ought also be enjoined because it was enacted for the purpose of excluding blacks. There is evidence in the record to support that contention. Opposition to Park View Heights was repeatedly expressed in racial terms by persons whom the District Court found to be the leaders of the incorporation movement, by individuals circulating petitions, and by zoning commissioners themselves. Racial criticism of Park View Heights was made and cheered at public meetings. The uncontradicted evidence indicates that, at all levels of opposition, race played a significant role, both in the drive to incorporate and the decision to rezone. We agree with the Tenth Circuit's conclusion that improper purpose may be shown circumstantially:

> \* \* \* If proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Four-

teenth Amendment offers little solace to those seeking its protection. In our opinion it is enough for the complaining parties to show that the local officials are effectuating the discriminatory designs of private individuals. \* \* \*

Dailey v. City of Lawton, 425 F.2d 1037, 1039 (10th Cir. 1970).

Nevertheless, we do not base our conclusion that the Black Jack ordinance violates Title VIII on a finding that there was an improper purpose.

**4.** The requirement that a governmental defendant demonstrate that its conduct is necessary to further a compelling governmental interest is most often expressed in cases involving equal protection challenges to statutes or ordinances creating "suspect classifications," *see* In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), or impinging on "fundamental rights." *See* Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). Even though this case is based on a federal statute, rather than on the Fourteenth Amendment, we believe that, once the United States established a prima facie case of racial discrimination, it became proper to apply the compelling governmental interest requirement of the equal protection cases.

461 F.2d 1171 (1972). *See also* Village of Belle Terre v. Boraas, *supra* 416 U.S. at 5, 94 S.Ct. at 1539, 39 L.Ed.2d at 802 (dictum).

■ The District Court concluded that the ordinance had no discriminatory effect. It based this conclusion on its finding that, because Park View Heights was designed to meet the needs of families earning between $5,000 and $10,000 per year—a class including 32 percent of the black population in the metropolitan area and 29 percent of the white population—the ordinance had no measurably greater effect on blacks than on whites. The court's conclusion was in error. It failed to take into account either the "ultimate effect" or the "historical context" of the City's action. See United Farmworkers of Florida Housing Project, Inc. v. City of Delray Beach, *supra* 493 F.2d at 810; Kennedy Park Homes Ass'n v. City of Lackawanna, *supra* 436 F.2d at 112. The ultimate effect of the ordinance was to foreclose 85 percent of the blacks living in the metropolitan area from obtaining housing in Black Jack, and to foreclose them at a time when 40 percent of them were living in substandard or overcrowded units.

The discriminatory effect of the ordinance is more onerous when assessed in light of the fact that segregated housing in the St. Louis metropolitan area was

> * * * in large measure the result of deliberate racial discrimination in the housing market by the real estate industry and by agencies of the federal, state, and local governments.
> * * *

United States v. City of Black Jack, Missouri, *supra* 372 F.Supp. at 326.[5]

Black Jack's action is but one more factor confining blacks to low-income housing in the center city, confirming the inexorable process whereby the St. Louis metropolitan area becomes one that "has the racial shape of a donut, with the Negroes in the hole and with mostly Whites occupying the ring." Mahaley v. Cuyahoga Metropolitan Housing Authority, 355 F.Supp. 1257, 1260 (N.D.Ohio, 1973), rev'd, 500 F.2d 1087 (6th Cir. 1974). *See also* Crow v. Brown, 332 F.Supp. 382, 384 (N.D.Ga., 1971), aff'd per curiam, 457 F.2d 788 (5th Cir. 1972). Park View Heights was particularly designed to contribute to the prevention of this prospect so antithetical to the Fair Housing Act. The Board of Directors of the Park View Heights Corporation was one-half white and one-half black. Affirmative measures were planned to assure that members of the black community would be aware of the opportunity to live in Park View Heights. There was ample proof that many blacks would live in the development, and that the exclusion of the townhouses would contribute to the perpetuation of segregation in a community which was 99 percent white.

■ It having been established that the ordinance had a discriminatory effect, it follows that the United States had made out a prima facie case under Title VIII, and the burden shifted to the City to demonstrate that a compelling governmental interest was furthered by that ordinance. We turn to that question. The City asserted primarily the following governmental interests to justify the ban on further apartments:

(1) Road and traffic control;

(2) Prevention of overcrowding of schools;

(3) Prevention of devaluation of adjacent single-family homes.

Several other interests were also alluded to in the record, including exclusion of apartments where there were already too many and where there was no need for them.

■ In determining whether any of these rise to the level of a compelling governmental interest, we must examine: first, whether the ordinance in fact

---

**5.** The parties stipulated to this at trial.

furthers the governmental interest asserted; second, whether the public interest served by the ordinance is constitutionally permissible[6] and is substantial enough to outweigh the private detriment caused by it;[7] and third, whether less drastic means are available whereby the stated governmental interest may be attained. See Shapiro v. Thompson, 394 U.S. 618, 637, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Note, Exclusionary Zoning and Equal Protection, 84 Harv.L.Rev. 1645, 1651 (1971).

We need not go beyond the first step in the inquiry, for we find that there is no factual basis for the assertion that any one of the three primary interests asserted by the City is in fact furthered by the zoning ordinance, and we find that the other asserted interests—at least on the facts of this case—are clearly not substantial in relation to the housing opportunities foreclosed. To paraphrase the Supreme Court in Shapiro v. Thompson, supra at 638, 89 S.Ct. 1322, we conclude that the City does not use and has no need to use the ordinance for the governmental purposes suggested.

On the subject of roads and traffic, Mr. Barbero, the City's former mayor and lead witness, conceded on cross-examination that his opposition to Park View Heights on the basis of its impact on traffic and roads was based on incorrect information and was, therefore, wrong. The evidence amply supports his concession. Park View Heights was to be located next to Old Jamestown Road, which is the most direct route from Black Jack to Jamestown Mall, a large shopping center in the process of construction which is to have ninety-five stores and is to employ approximately 2500 persons. The City did not oppose the construction of the Mall, despite the fact that it would generate far more traffic than would Park View Heights. Moreover, there was uncontradicted evidence that construction of single-family homes on the proposed site would result in numerous driveways leading onto Old Jamestown Road, creating a serious traffic hazard on the shopping center's main access road which would be avoided by a multiple-family dwelling with a single driveway.

The asserted community interest in preventing overcrowding of the schools also was not furthered by the ordinance. The St. Louis County Planning Department had determined that, in the school district which embraced Black Jack, apartments produced approximately one schoolchild for every five families, while single-family houses produced almost three schoolchildren, or fifteen times as many. In the light of that evidence, several defense witnesses conceded that the desire to prevent overcrowding of the school system could not supply a rational basis for the ordinance, and defense counsel stated at one point in the trial that school impaction was not an issue in the case. Moreover, there was nothing in the record to indicate that the school facilities were already overcrowded.

The third asserted justification of preventing devaluation of adjoining single-family homes was also not furthered by the ordinance. The St. Louis Planning Department, after conducting a study, concluded that apartment complexes in the St. Louis metropolitan area had not had such an effect on property values. This conclusion was buttressed by the testimony of expert witnesses, and was

---

6. This portion of the analysis is essentially a qualitative one. For example, Shapiro v. Thompson, supra 394 U.S. at 629–631, 89 S.Ct. 1322, 22 L.Ed.2d 600, held that it was constitutionally impermissible for a state to inhibit migration by needy persons into the state, because such migration was a constitutional right. That case further held that limiting payment of welfare benefits to those who had "contributed" to the state in the past through taxes was constitutionally impermissible. Id. at 633, 89 S.Ct. 1322.

7. This portion of the analysis is essentially quantitative. For example, preservation of the public peace and welfare by avoiding racial conflict was held insufficient to validate a zoning ordinance restricting racial integration in Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917).

not contradicted by any competent evidence.

None of the other reasons advanced by the City is a substantial one on the basis of the record. The assertion that there were already "too many" apartments in Black Jack was not borne out by the evidence. Under the original plan set up by St. Louis County for the Black Jack area, less than four percent of the land was set aside for apartments. The expert testimony was that this was a conservative allocation and that Black Jack's topography and work force could accommodate different types of residential dwellings. The effect of the ordinance was to slash the conservative four percent figure to less than one percent. There was no expert testimony that this was necessary to prevent unacceptable density. The assertion that there was no "market" or "need" for Park View Heights in the Black Jack area was also unsupported. The evidence was to the contrary, for it demonstrated a strong demand for suburban apartments in St. Louis County.

We hold that Zoning Ordinance No. 12 of the City of Black Jack violates Title VIII, because it denies persons housing on the basis of race, in violation of § 3604(a), and interferes with the exercise of the right to equal housing opportunity, in violation of § 3617. The remedy for this violation of the Fair Housing Act is provided in § 3615:

> * * * any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid.

We, therefore, reverse and remand with instructions to the District Court to enter a permanent injunction upon receipt of this Court's order, enjoining the enforcement of the ordinance.[8] The mandate of this Court shall be issued forthwith.

Reversed and remanded.

---

8. Since we award relief to the United States, the defendant's contention that the District

Court erred in refusing to award attorney fees to the defendant is without merit.