**FAMILYSTYLE OF ST. PAUL, INC., a Minnesota corporation, Plaintiff,**

v.

**CITY OF ST. PAUL, MINNESOTA, a municipal corporation; St. Paul City Council; Individual City Council Members; James Scheibel; Robert Long; Kiki Sonnen; Janice Rettman; Roger Goswitz; Tom Dimond; State of**

Minnesota Office of the Attorney General; and Hubert H. Humphrey III, Attorney General, Defendants.

No. 3–89 CIV 459.

United States District Court,
D. Minnesota,
Third Division.

Jan. 18, 1990.

Earl P. Gray, and Richard J. Malacko, St. Paul, Minn., for plaintiff.

Jerome J. Segal, Asst. City Atty., St. Paul, Minn., for defendant City of St. Paul.

Gail M. Olson, Asst. Atty. Gen., St. Paul, Minn., for defendant Hubert H. Humphrey III.

ORDER

ALSOP, Chief Judge.

The above entitled matter came before the court December 27, 1989 on motions for summary judgment. Familystyle of St. Paul, Inc. ("Familystyle") and the City of St. Paul have both moved for summary judgment. The Attorney General has not formally noticed a motion, but agrees that summary judgment is appropriate at this time and has requested that judgment be entered in his favor. The parties have signed a "Stipulation of Facts" for the purposes of this motion and certain other facts recited by the parties are not disputed. Summary judgment is therefore appropriate because there are no genuine issues of material fact and the decision may be made as a matter of law.

I. FACTS

At issue in this case are three sets of laws: the 1988 amendments to the Fair Housing Act ("FHA" or "Title VIII"), the Minnesota Human Services Licensing Act, and the City of St. Paul Zoning Code. The Minnesota statute deals with the licensing of facilities which provide residential services for people with mental illness and retardation. To acquire a license for such a residential program, the applicant must comply with several special conditions. These special conditions are in place to

effectuate the Minnesota policy of deinstitutionalization of the mentally ill. That policy seeks to place the mentally ill in the least restrictive environment possible and allow them "the benefits of normal residential surroundings." *Minn.Stat.* § 245A.11, Subd. 1 (1988). The special conditions for the residential programs are contained in section 245A.11. That section states, in part, that:

> The commissioner shall not grant an initial license to any residential program if the residential program will be within 1,320 feet of an existing residential program unless the town, municipality, or county zoning authority grants the residential program a conditional use or special use permit.

*Minn.Stat.* § 245A.11, subd. 4.[1]

The City of St. Paul Zoning Code similarly provides that community residential facilities serving six or fewer people are permitted, "subject to the condition that a minimum distance of 1,320 feet will be required between zoning lots used for community residential facilities." City of St. Paul Zoning Code 60.413. This spacing requirement also applies to community residential facilities serving seven or more people. Zoning Code 600.423(3)(d).

Familystyle is engaged in the business of providing rehabilitative and human services of the mental health type. As such, it provides residential living for mentally ill individuals. Beginning on or about August 1, 1983 Familystyle leased and then purchased 21 properties within the City of St. Paul.[2] Familystyle operated community residential facilities at these 21 properties as legal, nonconforming uses under the city zoning code. In addition to these properties, plaintiff also leased three properties at 383 Colborne, 397 Colborne, and 385 Duke.

These were not permitted to be used as community residential facilities because they did not meet the zoning code definition of a nonconforming use.

In 1983, Familystyle requested special condition use permits from the city so that it could operate these three homes as residential facilities. The Planning Commission denied the permits because the facilities did not meet the 1,320–foot spacing requirement of the zoning code. On appeal to the City Council, the Commission's decision was reversed and permits were issued subject to five conditions. One of the conditions was that the special use permits would terminate as of October 1, 1988 and that Familystyle would work to disperse its facilities before that date. Familystyle did not implement such a program prior to October 1, 1988.

Instead of implementing a plan to disperse the facilities, Familystyle applied to the Planning Commission in October of 1988 to renew the special use permits for the three facilities.[3] The Planning Commission declined to modify the 1,320–foot spacing requirement and denied the applications for conditional use permits. Familystyle appealed this determination to the City Council. The Council concluded that the Commission had not committed error in its findings and conclusions, and concurred in those findings.

As a consequence of the denial of the special use permits, Familystyle changed its Department of Human Services license. Familystyle turned in its license which had previously included 386 Duke, 383 Colborne, and 397 Colborne, and received another license which did not cover those properties. This had the effect of reducing the number of residents Familystyle could house from 130 to 119.

---

**1.** In its complaint, Familystyle also asked that this court declare section 245A.11, subd. 5 invalid. That subdivision deals with over-concentration and dispersal of residential programs. Although that subdivision may arguably conflict with the FHA amendments, plaintiff's counsel has acknowledged that subdivision 5 has nothing to do with Familystyle's current problem.

**2.** The addresses of these properties are: 354 Duke, 364 Duke, 367 Duke, 368 Duke, 370 Duke, 377 Duke, 382 Duke, 388 Duke, 390 Duke, 395 Duke, 398 Duke, 399 Duke, 403 Duke, 497 Palace, 496 Jefferson, 333 Oneida, 339 Colborne, 339½ Colborne, 375 Colborne, 381 Colborne, and 387 Colborne.

**3.** Familystyle sought to occupy 383 Colborne with 13 residents, 397 Colborne with six residents, and 386 Duke with four residents.

About the same time Familystyle was seeking renewal of its special use permits, amendments were made to the federal Fair Housing Act.[4] Section 3604 of that Act originally prohibited discrimination of any kind in the sale or rental of a dwelling because of race, color, religion, or national origin. In 1974, sex was added as a protected class, but otherwise the statute remained basically unchanged until 1988. In that year, Congress responded to President Reagan's statement that "reform of the Fair Housing Act is a necessity that is acknowledged by all." (H.R.Rep. No. 711, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2178) (hereinafter "House Report") and passed the Fair Housing Amendments Act of 1988 ("FHAA"). The amendments had three purposes, but the one applicable to this action is that the amendments were to extend "the principle of equal housing opportunities to handicapped persons." House Report, 1988 U.S.Code Cong. & Admin. News at 2174. The Fair Housing Act, as amended, makes it unlawful:

(f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

\* \* \* \* \* \*

(3) for purposes of this subsection, discrimination includes—

\* \* \* \* \* \*

(B) a refusal to make reasonable accommodations and rules, policies, prac-

tices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling;

42 U.S.C. § 3604(f)(1) & (3).[5]

On July 19, 1989 Familystyle filed suit in this court. Familystyle's argument is based upon the claim that the challenged state and local laws limit a handicapped person's choice of where to live. Section 3615 of the FHA states that any state or local law requiring or permitting a discriminatory housing practice is invalid.[6] Consequently, Familystyle argues that *Minn. Stat.* § 245A.11(4) and City of St. Paul Zoning Codes 60.413 and 60.423 must be declared invalid because they conflict with the express language of the FHA.

## II. ANALYSIS

The parties in this case disagree as to what method of analysis the court should use. Familystyle argues that this is a preemption case. It claims that section 3615 expressly preempts the area of housing regulations for the handicapped. If *any* state or local laws conflict or limit in any manner the broad federal provisions, they are to be invalidated. Defendants argue that this case does not involve preemption as such. To the extent that section 3615 applies, they claim that the spacing requirements do not constitute a "discriminatory housing practice" within the meaning of that section. They point out that the federal, state, and city laws all have the same purpose: to increase the housing alternatives available to the handicapped by fully integrating them into the community mainstream. They argue that this policy of deinstitutionalization does not conflict with the FHA. Viewed in this manner, they claim that even though laws may marginal-

---

**4.** Title VIII of the Civil Rights Act of 1968, codified at 42 U.S.C. § 3601 *et seq.*

**5.** "Handicapped" is defined at 42 U.S.C. § 3602(h). The defendants do not dispute that the residents of Familystyle are "handicapped" within the definition of the statute.

**6.** 42 U.S.C. § 3615 reads in its entirety as follows:

Nothing in this subchapter shall be construed to invalidate or limit any law of a State or

political subdivision of a State, or of any other jurisdiction in which this title shall be effective, that grants, guarantees, or protects the same rights as are granted by this title; but any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this title shall to that extent be invalid.

ly limit a handicapped person's freedom of choice in the present, they are not "discriminatory" because they work for the eventual benefit of the handicapped.[7]

Defendants further argue that the laws at issue deal with licensing and zoning provisions, and do not regulate the dwelling choices of handicapped individuals. They claim that even if these provisions have the secondary effect of making dwellings unavailable for the handicapped, they are nonetheless valid for either of two reasons. First, because handicapped people are not a suspect class, laws regulating their living arrangements need only have a rational basis to be upheld. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Alternatively, even if handicapped people are given special protections under the statute, the laws at issue here pass strict scrutiny because they are narrowly tailored to promote a compelling governmental interest. Defendants argue that for any of these reasons, the laws should be upheld.

### A. Preemption [8]

■ Familystyle claims the state and city laws are invalid because they conflict with the FHA. To decide if the laws do conflict, the first step is to categorize the challenged laws. The state's law regulates *residential programs* for mentally ill or retarded persons. If an organization or person wishes to have such a program licensed by the state, it must comply with the conditions laid out by the state. One of the conditions is that a new facility not be within 1,320 feet of an existing facility. The placement of residential facilities for

persons with mental illness or retardation is also regulated by city ordinance. Similar to the state licensing provisions, the zoning code prohibits the location of such facilities within 1,320 feet of existing facilities of that kind.

Equally as important as what these provisions prohibit is what they do not prohibit. They do not prohibit mentally ill *persons* from renting or buying a home within 1,320 feet of a residential facility. If that were the language of the laws, it would be prohibition or limitation on where the handicapped could reside. This would be in direct conflict with Title VIII and invalid under section 3615. However, the statute does not use that language. If one or more handicapped choose to rent or buy a home near a residential program, they are in no way barred from doing so by these laws. The laws relate only to the licensure and placement of residential programs.

Familystyle argues that even though the laws are technically zoning and licensing laws, not direct prohibitions on individuals, the laws are still invalid under the Act. Their support for this position comes from 42 U.S.C. § 3604(f)(1)(B). That section prohibits discrimination due to the handicap of "a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available." *Id.* They argue that the city denied it a special use permit only because handicapped people would reside in the facilities, and that these laws therefore "make unavailable or deny" housing to the handicapped. Further support for Familystyle's position can be garnered from the House Report accompanying the FHAA. The report states that:

---

**7.** The majority opinion in *United Steel Workers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), used analysis very similar to this. The Court held that the language used in Title VII of the Civil Rights Act of 1964 did not prohibit the private sector's use of race-conscious affirmative action plans. In making this ruling, the court rejected the argument that to "discriminate ... because of ... race" was to be interpreted literally to bar unequal treatment in favor of blacks. The Court stated that "[t]he prohibition against racial discrimination in §§ 703(a) and (d) of Title VII must ... be read against the background of the legislative history of Title VII and the historical context from

which the Act arose." *Weber*, 443 U.S. at 201, 99 S.Ct. at 2726. Defendants' argument in this case is similar in that they claim that the historical context and purpose of the laws prove the defendants' unequal treatment of the handicapped is favorable, not "discriminatory."

**8.** Although plaintiff has argued that 42 U.S.C. § 3615 is a preemption provision, section 3615 is not preemption of a total field of law because it invalidates only those state laws which *conflict* with federal law. With that understanding, the court will refer to the search for conflict as "preemption" analysis.

The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community.

House Report, 1988 U.S.Code Cong. & Admin.News at 2185.

The argument that this language from the House Report shows an intent to invalidate the state and local laws at issue here is not without merit. Nonetheless, the Act does not prohibit any and all state laws which have some impact on the handicapped. Even the House Report uses language which states that laws are prohibited which impact an *individual's* choice of residence. There is a significant difference between laws which directly regulate individuals and laws which regulate institutions. It is doubtful that in seeking to provide fair housing for the handicapped, the federal government intended to preempt all local regulation of the facilities which house them. Surely the Congress intended states to maintain some control over such facilities. The spacing requirements are a part of Minnesota's licensing process and the zoning code builds on those requirements in implementing its system. These laws do not directly bar handicapped individuals from residing at 386 Duke, or 383 and 397 Colborne. Because the handicapped are not directly prohibited from residing at these residences, and because states must maintain some authority over such institutions, the state and local laws are not "preempted" by section 3615.

### B. *Discriminatory Intent or Effect*

█ Even though the challenged laws are not "preempted" they still may be invalid if they are discriminatory within the meaning of Title VIII. Because this case is brought solely under the FHA, few previous Title VIII cases are directly applicable. Many of those cases dealt with racially discriminatory practices and were challenged under both Title VIII and the Equal Protection Clause. As such, the Title VIII analysis is intertwined with equal protection language and analysis. To properly analyze these Title VIII cases, the court finds it useful to adopt the methods and terminology used in cases brought under Title VII of the Civil Rights Act of 1964.

Drawing on this Title VII framework, it appears that a Title VIII case may be proved in either of two ways. *See Baxter v. City of Belleville, Ill.,* 720 F.Supp. 720, 732 (S.D.Ill.1989). The first way is that a plaintiff proves the defendants' actions were motivated by an intent to discriminate against the plaintiff because of a handicap. *See, e.g., Smith v. Anchor Building Corp.,* 536 F.2d 231 (8th Cir.1976) (use of prima facie case in individual discrimination action); *Williams v. Matthews Co.,* 499 F.2d 819 (8th Cir.1974) (applying *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), analysis to FHA claim). These cases are referred to as "disparate treatment" cases under Title VII. The second method of proving a violation of Title VIII is by showing that conduct produces a discriminatory effect, even though it was taken without discriminatory intent. *See, e.g., United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). Under Title VII nomenclature, this is referred to as a "disparate impact" case. These models will be dealt with separately so as not to confuse the analysis applicable to each.

### 1. *Disparate Treatment*

As the Supreme Court stated, disparate treatment "is the most easily understood type of discrimination." *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In a Title VIII case, it means that a person is denied housing on the basis of race, color, religion, sex, national origin, or handicap. Proof of discriminatory motive is crucial to a disparate treatment claim. *Id.* To succeed under a disparate treatment claim then, plaintiff must prove that the state and city passed

the laws in question with the intent of discriminating against the handicapped.[9]

The defendants argue that discrimination is not the intent of the laws. The Attorney General claims that the state's intent in enacting the law was to deinstitutionalize services for the handicapped. The city, through its zoning ordinance, seeks to implement this policy of the state and to also deal with the city's zoning patterns. A description of the state's program is found in a 1986 state auditor's report. The report states that:

> The state hospitals were the primary providers of services to mentally disabled persons until the late 1950s. At that time, a new group of social reformers successfully argued for *normalization.* That is, disabled persons should live where they have the best opportunity to lead normal lives. The reformers further argued that community settings, rather than state hospitals, would provide the *least restrictive environment* for most people. This led to *deinstitutionalization,* a broader reform, with two main thrusts: creating a full range of new community services and reducing the population of state institutions.
>
> Federal and state governments passed laws to encourage the development of community services and to reduce state hospital populations.

"Deinstitutionalization of Mentally Retarded People," Office of the Legislative Auditor, State of Minnesota, February 1986, at p. 3 (emphasis in original).

One of the ways in which the state sought to achieve this deinstitutionalization was through the dispersal of facilities for the mentally ill. In 1976, the Legislature adopted the current spacing requirement of 1,320 feet for newly licensed group residential facilities. 1976 Minn.Laws, ch. 243, § 12 subd. 2. This space limitation coexists with subdivision 1 of section 245A which states that "[i]t is the policy of the state that persons shall not be excluded by municipal zoning ordinances or other land use regulations from the benefits of normal residential surroundings." *Minn.Stat.* § 245A.11(1). In furtherance of its goal of deinstitutionalization, the Legislature amended section 245A.11 in 1984. That amendment ordered counties to take affirmative steps to promote the dispersal of group residential facilities. 1984 Minn. Laws, ch. 617 § 5. This law too was addressed at assuring that the mentally ill would receive treatment in noninstitutional settings.

The State Legislature is not alone in its concern for the placement of the mentally ill. The Minnesota courts have also recognized the state's interest in the placement of group homes. In *Costley v. Caromin House, Inc.,* 313 N.W.2d 21 (Minn.1981), the court did not allow an attempt to exclude from a community a residential facility for mentally ill. In doing so, the court stated:

> The zoning statutes guarantee that local governments cannot frustrate state and national policy of permitting mentally retarded persons to participate in normal residential communities.
>
> Minnesota is one of an increasing number of states that have enacted legislation designed to facilitate acceptance of group homes in residential communities.

*Id.* at 27.

This policy of deinstitutionalization, intended to benefit both the individual and the community as a whole, is also a federal concern. In the Developmental Disabilities Assistance and Bill of Rights Act Amend-

---

**9.** Typically, disparate treatment cases use the concept of a prima facie case. Under the FHA, the prima facie case consists of a protected class buyer or renter putting in proof that they meet the objective requirements of a seller or landlord and that the sale or rental would likely have been consummated were they not a member of a protected class. *See, e.g., Smith v. Anchor Bldg. Corp.,* 536 F.2d 231, 233 (8th Cir. 1976). The court is unsure of how to use this prima facie case in the context of an allegation of unlawful state and local laws. This court agrees with the Second Circuit that the proper analysis in a Title VIII case brought against a public defendant is the disparate impact approach of Title VII. *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir.1988). Plaintiff, however, has argued this case as if it were a case of disparate treatment, and the court will do its best to directly determine the intent of the laws in question.

ments of 1987, Congress found that it was in the national interest to allow the disabled to live in typical homes and communities to the maximum extent feasible. 42 U.S.C. § 6000(a)(8). This concern is also echoed in the House Report of the FHAA. The report states that "[t]he Fair Housing Amendments Act ... is a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." House Report, U.S.Code Cong. & Admin. News at 2179. The thrust of all these statements goes to prove that the Legislature's intent in passing the laws in question was not to burden the handicapped, but to work for their benefit.

Plaintiff takes issue with the reputed purposes of the challenged laws. Familystyle argues that these distance requirements are nothing but a tool which property owners may use to exclude the handicapped from their communities because of their fears of harm or decline in property value. In support of its viewpoint, Familystyle has submitted the minutes of the St. Paul City Council meeting of August 18, 1988 at which people spoke in connection with Familystyle's application for a special condition use permit.

The minutes of that meeting show that a few individuals did voice concerns over safety and property devaluation. These statements show that some people have and will attempt to take advantage of these laws for reasons other than the benefit of the handicapped. However, these few comments by individuals cannot stand as the true intent of the political bodies which passed these laws. If in fact the property valuation and safety concerns are the focus of these laws, it is indeed a very elaborate ruse which has been perpetrated. The purpose of deinstitutionalization has been echoed by the Attorney General, the Legislature, the courts, and Congress itself. Whether or not deinstitutionalization via dispersion and other measures is to become the final program in the care and treatment of the mentally ill, at this time the intent of these laws is clear. Their purpose is to benefit the handicapped and the entire community through a process of deinstitutionalization.

### 2. *Disparate Impact*

A law enacted without discriminatory intent may still be invalid if it has a disparate impact on a protected group. A prima facie case of disparate impact is established by showing that the practice of the defendant "actually or predictably results in ... discrimination; in other words, that it has a discriminatory effect." *Black Jack*, 508 F.2d at 1184. The plaintiff need not prove the decision was made with discriminatory intent. *Id.* at 1185.

To make out a prima facie case, therefore, all plaintiff needs to do is prove the city ordinance and state statute have a discriminatory effect. This case was somewhat unique in a disparate impact setting in that neither party put forward statistics regarding the impact of the ordinance on a protected classification. The reason for this seems obvious. Although the laws do not directly regulate the handicapped, they do limit some facilities where handicapped people would choose to live. Defendants do not seriously dispute that certain handicapped individuals may want to reside at one of the three residences, in a residential program setting, and not be able to because of these laws. If there is even one person in that situation, the law has a discriminatory effect on that person—it limits the freedom of that individual to live where he or she would wish. Although no statistics were put forward showing how many people would be affected in this manner, the number is not crucial. The fact is that *all* people who are affected in this manner, no matter how large or small the number may be, are handicapped. The laws do not limit the housing choices of any other group. Therefore, the law does, on its face, have the effect of limiting the housing choices of the handicapped.

Once a plaintiff has made out a prima facie case, the burden of proof shifts to the government to "demonstrate that its con-

duct was necessary to promote a compelling governmental interest." *Id.*[10] As discussed earlier, the interest of the city and state is deinstitutionalization and integration of the mentally ill into the community mainstream. To determine whether this is a compelling governmental interest the court must look at several factors: 1) whether the ordinance in fact furthers the interest asserted; 2) whether the public interest served by the ordinance is constitutionally permissible and substantial enough to outweigh the private detriment caused by it; and 3) whether less drastic means are available to attain that interest.[11] *Black Jack*, 508 F.2d at 1186–87.

### a. Do the Laws in Fact Further the Interests Asserted

The state licensure laws seek to assure that the mentally ill receive adequate care in a proper setting. *Northwest Residences, Inc. v. Brooklyn Center*, 352 N.W.2d 764, 773 (Minn.Ct.App.1984). The state has determined that a proper setting is one which is, as much as possible, in the mainstream of the community. Forcing new residential facilities to locate at a distance from other facilities by its very terms prevents the clustering of homes which could lead the mentally ill to cloister themselves and not interact with the community mainstream. Because the state and local laws prohibit this clustering effect, they do further the goal of integrating the handicapped into the community.

### b. Do the Permissible Constitutional Interests Outweigh the Private Detriment Caused by the Laws

The first part of the second factor is to consider whether the public interest served by the laws is constitutionally permissible. States have licensing requirements in a variety of areas. Similarly, local governments make decisions every day on the basis of valid zoning codes. These are not constitutionally impermissible interests. The fact that these laws secondarily impact the mentally ill or retarded fails to make the interests less permissible. In *Cleburne*, the Supreme Court held that the mentally retarded are not a suspect class, therefore laws which even directly regulate them require only a rational basis to be upheld. 473 U.S. at 446, 105 S.Ct. at 3257. Obviously, laws which seek to benefit the handicapped through integration in the community have a rational basis. The state and local laws in question therefore have interests which are constitutionally permissible.

The second part of the second factor is whether the public interests sought to be furthered by the laws are substantial enough to outweigh the private detriment caused by them. In this case, Familystyle has suffered only a denial of its special condition use permit. There has been no evidence introduced that a handicapped person has actually been turned away from Familystyle because it had been denied a permit for 386 Duke, 383 Colborne, or 397 Colborne. The court therefore finds that the private detriment is minimal. On the

---

10. The showing required of the government has been defined differently in other circuits. In *Huntington*, the Second Circuit agreed with the Third and held that a "defendant must prove that its actions furthered, in theory and practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." *Huntington*, 844 F.2d at 936. In light of the fact that the Supreme Court has held that the mentally retarded do not constitute a suspect classification, it seems that analysis less than strict scrutiny is proper. As alluded to earlier, most FHA cases simultaneously alleged equal protection violations, consequently many of the FHA cases contain constitutional analysis. Even though *Black Jack* itself dealt with only a Title VIII challenge, the charge was based on racial dis-

crimination and that fact may have influenced the scrutiny given the law. Nonetheless, this court has found no Eighth Circuit case which in any way narrows or overrides the compelling governmental interest test enunciated in *Black Jack* and will use that standard in its analysis.

11. In *Black Jack*, the district court had held a trial to discover the facts which were used in this analysis. This case has not had the benefit of the factual development by trial, but all parties have agreed that the case is ripe for summary judgment. The court will therefore use those facts which are undisputed to determine the mixed questions of law and fact to decide whether this case truly involves compelling governmental interests.

other hand are the interests favoring deinstitutionalization. These interests go beyond the monetary ones of an organization, or a limitation of choice on a small number of handicapped individuals. The laws fostering deinstitutionalization seek to enhance the individual lives of all handicapped and to improve society as a whole through the integration of these people into the mainstream. These societal goals substantially outweigh the limited monetary harm or speculative individual harm which may be caused by the challenged laws.

### c. Less Drastic Alternatives

Finally, the third factor to consider is whether less drastic means could be used to effectuate the same policy. The spacing requirement law, by itself, is obviously not going to assure that the mentally ill and retarded have opportunities to live as normal, independent lives as possible. However, it is one important aspect of the deinstitutionalization policy, and if less drastic means exist with which to accomplish that policy, they have not been pointed out to the court.

One facile proposal of a less drastic alternative would be that a requirement of only 1,000, or 660, or 330 feet between facilities be used. This would be less restrictive and still eliminate the "ghettoization" of the mentally ill. It could be that this is true. However, this argument is premature at this time. If at some time in the future the number of residential homes has grown or they have dispersed to the extent that it becomes impossible to locate a residential home in the city without it being within 1,320 feet of another facility, the argument for reducing the distance requirement will have more force. Until such evidence is presented, however, this court is unwilling to say that a distance requirement of less than 1,320 feet is necessary to save the laws in question. Accordingly, the court finds that these spacing and dispersal requirements are the least drastic means to attain the interests asserted.

### III. CONCLUSION

It is possible that with its limited insight and finite capabilities, the court has miscalculated some of the factors in this case. Possibly the Congress really did intend to invalidate these types of regulation. Possibly they intended that the handicapped were to be afforded total and unrestrained freedom in their choice of residence. In another sense, maybe laws which regulate the lives of the handicapped "for their own good" limit them unnecessarily. Maybe future generations will look upon these laws as archaic trappings of an unenlightened society. Whether or not the future holds such possibilities, this court must apply the law as it now finds it. The Supreme Court has stated that political bodies may enact laws which in some way, shape, or form affect mentally ill or retarded people. The state and local governments in Minnesota have done exactly that in this case. These laws are not preempted by the FHA because they do not directly conflict with it. Neither are the laws invalid because they evince an intent to discriminate against the handicapped. However, they do have the effect of making housing for the handicapped unavailable. This discriminatory effect is permissible, however, because the laws are narrowly drawn to promote a compelling governmental interest.

Accordingly, based on the foregoing, the arguments of counsel, and the entire file as presently constituted,

IT IS HEREBY ORDERED That:

1. Plaintiff's motion for summary judgment is DENIED;

2. The City of St. Paul's motion for summary judgment is GRANTED; and

3. The Clerk of Court is directed to enter judgment as follows:

IT IS ORDERED, ADJUDGED AND DECREED That plaintiff's complaint be, and hereby is, DISMISSED in its entirety and with prejudice and that Familystyle of St. Paul, Inc., have and recover nothing by this action.