**Daisy CASON, Debbie Doe, and Betty Roe, on behalf of themselves and all persons similarly situated, Plaintiffs,**

v.

**ROCHESTER HOUSING AUTHORITY, Thomas F. McHugh, individually and in his capacity as Executive Director of the Rochester Housing Authority, and Donna Smith, individually and in her capacity as Housing Assistant, Defendants.**

**No. Civ. 90–250L.**

United States District Court,
W.D. New York.

Aug. 6, 1990.

Richard A. Kaul, Fulreader, Rosenthal, Sullivan, Clifford, Santoro & Kaul, Rochester, N.Y., for defendants.

## DECISION AND ORDER

LARIMER, District Judge.

For over two hundred years our Country has prospered under the principle that all men and women should have an equal opportunity to enjoy "life, liberty and the pursuit of happiness."

There was a time when the disabled did not have the same opportunities and were relegated to a kind of second class status in employment, housing and transportation. That circumstance was caused more by the community's misinformation and thoughtlessness than by the individual's actual disabling condition. Much has been done to eliminate this situation but it would be simplistic to believe that problems do not remain. Public agencies must be especially vigilant to protect the disabled from all forms of discrimination—intentional as well as benign discrimination caused by the public's perception of what is "best" for the disabled.

This case revolves around claims that the Rochester Housing Authority ("Authority") discriminates against disabled applicants for public housing. Three applicants who have physical and mental disabilities and whose applications for public housing were denied, commenced this action seeking declaratory and injunctive relief on behalf of themselves and a class of similarly situated applicants.

Because I believe that the Authority uses eligibility criteria for public housing that tend to discriminate against those with handicaps and because I believe those requirements cause the Authority to consider handicapped applicants by a different standard than so-called able-bodied applicants, the eligibility standards are in clear violation of federal law and must be struck down.

## PROCEDURAL BACKGROUND

Elizabeth L. Schneider, Monroe County Legal Assistance Corp., Rochester, N.Y., for plaintiffs.

Plaintiffs have brought this action under the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.*, the Rehabilitation Act of

1973, 29 U.S.C. § 794, and the United States Housing Act, 42 U.S.C. § 1437 *et seq.* The three named plaintiffs claim that their applications for low-income public housing were denied by the Authority because of plaintiffs' handicaps in clear contravention of federal law, which makes it illegal to discriminate in housing based on the physical or mental disability of an applicant.

One of the plaintiffs is a 31 year-old woman who has been diagnosed as schizophrenic and the other two are elderly women, each of whom suffers from various physical handicaps and one of whom has also been diagnosed as schizophrenic. In spite of their handicaps, plaintiffs contend that they meet all of the legitimate eligibility requirements and that the denial of their application was based on an impermissible evaluation of their disabilities.

The matter was originally before me on plaintiffs' motion for a preliminary injunction and for class certification. At that initial appearance on the preliminary injunction motion, the parties agreed to consolidate the hearing on the motion for a preliminary injunction with trial on the merits as to some of the disputed issues. The Court gave the parties leave to supplement the record concerning any disputed factual issues and the matter has now been submitted to the Court for decision.

The complaint charges the Authority with several discriminatory practices in its application process. Plaintiffs claim that the Authority imposes an arbitrary and subjective "ability to live independently" standard in determining whether to approve an application for public housing by a disabled applicant. Plaintiffs claim that this standard violates several federal statutes and current federal regulations that were adopted concerning fair housing and the handicapped. The Authority's application process violates federal law because it authorizes and condones detailed inquiries into the nature and scope of the applicant's disabling condition and because it requires, in some cases, that the applicant release confidential medical information. Plaintiffs also claim that the Authority fails to give adequate and proper notice of actions taken on housing applications.

## FACTS

The eligibility standards for public housing controlled by the Authority are set forth in the Rochester Housing Authority Rental and Occupancy Manual, § 124 at pp. 17–18. The Manual was promulgated in May, 1988. The "Standards for Tenant Selection Criteria" allow consideration of the following:

a) an applicant's ability to live independently, or to live independently with minimal aid;

b) an applicant's past performance in meeting financial obligations, especially rent, unless good cause can be shown for non-payment of rent;

c) a record of disturbance of neighbors, destruction of property or of living or habits at prior residences which may adversely affect the health, safety and of other tenants (sic);

d) a history of criminal activity involving crimes of physical violence to persons or property, or other criminal acts which would adversely affect the health, safety, and welfare of other tenants.

Plaintiffs challenge only the standard relating to the "ability to live independently" and the Authority's inquiries and procedures utilized to make that determination.

The "ability to live independently" is defined in the Manual as follows:

Ability to live independently shall mean that an applicant is able to perform those basic functions of adult living for and by him/her self. These activities include: ability to understand and to sign contracts and legal agreements, ability to perform basic housekeeping and personal care; ability to perform necessary daily activities ability to understand and conform to applicable standards of safety. (sic)

The facts relating to the procedures utilized by the Authority in reviewing and assessing applications are largely undisputed and are set forth in the record by affidavit and deposition testimony. The Authori-

ty classifies all applicants for housing into two general categories. Into the first category fall families. Individual applicants, be they elderly or handicapped, are lumped into the second.

All *individual* applicants undergo an in-home evaluation, performed by an employee of the Authority. Prospective tenants in this category also are asked to complete a questionnaire, which contains many of the questions challenged in this action as discriminatory and intrusive. Each individual applicant signs a form consenting to the release of otherwise confidential medical information, although that information is not obtained in all cases.

The Authority employee who reviews the application then makes a subjective determination, based on her/his observations of the applicant and the answers to the questionnaire, whether circumstances exist to justify further inquiry into the applicant's ability to live independently in public housing. If such an investigation is deemed necessary, the application is referred to a social worker, who is in some cases employed by the Monroe County Health Department. In some instances, the social worker conducts a nursing evaluation, during which a variety of specific questions concerning the applicant's disability, personal hygiene and ability to live independently are asked.

Based on all this information, the Authority then makes a decision to accept or reject the application. In many instances concerning applications from handicapped individuals, the decision to deny housing is specifically based on the applicant's perceived inability to "live independently." There were no reported rejections of non-handicapped applicants for this reason.

Plaintiffs allege that the Authority denied their applications for housing solely on the basis of their handicaps.

In the case of plaintiff Cason, she received a letter dated February 6, 1990 from defendants, which stated that her application was denied because of her need for a wheelchair, because she is able only to walk short distances with the aid of a walker, because she is incontinent and relies on adult diapers, and because she would require 10 hours of daily aide service. The letter, attached to the complaint as exhibit "F," makes repeated reference to the Authority's conclusion that Cason is unable to live on an independent basis.

The evidence relating to the denial of plaintiff Doe's application consists of a short letter dated August 24, 1989 (attached to the complaint as exhibit "G") and the deposition testimony of Donna Smith, a housing specialist employed by the Authority who testified that the decision to deny Doe's application was chiefly hers. The letter recommends that Doe attempt to live independently of her parents for a period of 18 months, after which time the Authority would re-evaluate her "independent skills."

Smith testified at her deposition that she rejected Doe's application because she exhibited an inability to live independently and because Smith feared Doe would be uncooperative and might have trouble fulfilling the obligations of tenancy, chiefly that she might fail to pay the rent on time. Smith reached her decision on the basis of her own personal observations of Doe's behavior during a home visit, as well as information provided by Doe's therapist. Smith testified that during the visit, Doe repeatedly complained about small matters unrelated to the visit and appeared unable to understand questions or directions, and that subsequent to the interview, Doe made repeated telephone calls to Smith's office regarding a variety of complaints. At her deposition, Smith denied that these calls were related to the fact that the Authority had "lost" Doe's application for *two years* prior to this time although an activity sheet relating to Doe's file indicated that several of the telephone calls were "about [Doe's] application."

Smith also testified that Doe's counselor at Rochester Mental Health voiced similar reservations about Doe's ability to live independently, and had recommended to Doe, apparently without success, that she move into a group home. Although Doe did submit a landlord reference stating that she had paid her rent and had created no other

problems, Smith discounted the reference because the "landlords" were Doe's parents.

The only written communication to Doe concerning her rejection consists of the letter referred to above. Smith testified that in conversations with Doe, however, she told Doe that the main reason for the denial was her perceived inability to live independently.

Attached to the complaint as exhibit "J" is a December 1988 letter to Plaintiff Roe from Donna Smith, informing her that her housing application was being denied because she required a higher level of care than the Authority could offer. Exhibit "K" is a memo to Smith directing her to remove Roe's name from the waiting list for the Enriched Housing Program because of an "involved psych history."

Further evidence concerning the denial of plaintiff Roe's application can be gleaned from the deposition testimony of Kathleen Richards, a Social Services Assistant at the Authority. Richards apparently made the decision to deny Roe's application for a program known as Extended Shared Aid Program (ESAP) housing, to which Roe's application had been referred by the Tenant Selection Division of the Authority, after Roe was rejected for Enriched Housing.

Richards testified that she based her decision in part on documentation in the nursing evaluation file, which indicated that Roe was in need of support services and had a history of resistance to such services. The applicant's assessment questionnaire revealed that Roe had been hospitalized, had felt "depressed" at times, and was bothered by noises. Finally, Richards referred to a conversation with the director of the Enriched Housing Program, who stated that his file on Roe contained evidence that Roe had suffered for some time from a variety of physical and mental afflictions, had questionable hygiene habits, and had a history of non-cooperation with service providers.

Apparently no adverse information about plaintiff Roe was obtained from prior landlords. In fact, Donna Smith testified that Roe's prior landlord in New York City had experienced no difficulties with Roe's ability to comply with the terms of her lease.

## DISCUSSION

A. Applicability of Statutes to the Authority.

■ Although the parties do not dispute the issue, there appears to be no question that the Fair Housing Act and the Rehabilitation Act apply to the Authority.

The Fair Housing Act, 42 U.S.C. at § 3603, extends generally to dwellings provided in whole or in part with the aid of Federal monies. The Fair Housing Amendments Act of 1988 ("FHAA"), P.L. 100–430, for the first time extended the protections of the Fair Housing Act to the handicapped; prior to that time, it had prohibited discrimination only on the basis of race, color, religion, sex and national origin.

On the other hand, the Rehabilitation Act, § 794 of Title 29, U.S.C., from its enactment in 1973, has prohibited discrimination against handicapped persons "under any program or activity receiving Federal financial assistance." In 1988, Congress amended this section, along with other civil rights legislation, via the Civil Rights Restoration Act, P.L. 100–259. The amendments added to § 794 a definition of "program or activity," which definition appears to include the Authority. *See* 29 U.S.C. § 794(b). It is clear, however, from the legislative history, that the amendments were not intended to extend the application of the act to entities such as the Authority, but merely to *clarify* what had from the beginning been Congress' intent to make the Rehabilitation Act broad and far-reaching in its application. *See* S.Rep. No. 100–64, 100th Cong. 2d Sess. 4, 8, *reprinted in* 1988 U.S.Code Cong. & Admin.News 1, 6, 8–9. The court is aware of no authority holding that the Rehabilitation Act of 1973 did not apply to the challenged practices before its amendment in 1988.

The record contains no direct evidence that the Authority receives federal monies. Defendants' documentation, however, along with representations at argument

concerning the extent to which HUD exerts control over the Authority, convinces the Court that the Authority receives some financial assistance from HUD and, therefore, must comply with all federal statutes that prohibit discrimination against the handicapped.

**B.  Fair Housing Act.**

██  The court finds that the challenged practices violate the Fair Housing Act. The Fair Housing Amendments Act (FHAA), passed in 1988, extended the protections embodied in the Fair Housing Act to handicapped persons. Title 42 U.S.C. § 3604(f)(1) now makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." Section 3602(h) defines "handicap" as including any "physical or mental impairment which substantially limits one or more ... major life activities." The defendants do not dispute that the plaintiffs are handicapped as defined by the statute.

*Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir. 1988), *aff'd on other grounds,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) established that plaintiffs suing under the Fair Housing Act can succeed *either* by showing discriminatory impact or discriminatory treatment. Proof of the latter requires a showing of intent to discriminate. Plaintiffs allege only that the Authority's practices have the *effect* of discriminating against handicapped individuals.

Defendants point out that, since 1987, of 276 handicapped applicants for housing, only 17 have had their applications denied on the basis of conclusions reached from the application of the challenged "ability to live independently" criteria. They argue that this statistic proves that there is no discriminatory effect.

The Authority, however, improperly measures effect. A plaintiff makes out a prima facie case of disparate impact by showing that a given practice has a greater impact on handicapped applicants than on non-handicapped ones. *See Metropolitan*

*Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1288 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *Baxter v. City of Belleville,* 720 F.Supp. 720, 732 (N.D.Ill.1989). Thus, discriminatory effect is shown by proof that all persons negatively affected by an allegedly unlawful practice are handicapped. *See Familystyle of St. Paul v. City of St. Paul,* 728 F.Supp. 1396, 1403 (D.Minn.1990). In this case, defendants deny housing only to handicapped applicants on the basis of an inability to live independently; no non-handicapped persons apparently were denied housing on the basis of their inability to live independently. I therefore find that plaintiffs have sufficiently shown discriminatory effect.

Having determined the existence of adverse impact, the question remains whether defendant somehow may avoid liability under the Act. As phrased in *Town of Huntington,* 844 F.2d at 936, "the defendant must prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect."

██  I find defendants' justifications for their actions to be without merit. Defendants contend that inquiring into a handicapped person's ability to live independently furthers the goal of ensuring that tenants will respect the property and rights of other residents. As discussed *infra,* the need to protect other tenants from physical dangers posed by destructive tenants surely is an important governmental interest. Nevertheless, I am not convinced that delving into an applicant's confidential medical history, or requiring that the applicant demonstrate an ability to live independently, are the least discriminatory methods of advancing that interest.

In enacting FHAA, Congress specifically considered the plight of housing applicants with mental illnesses. "In the case of a person with a mental illness ... there must be objective evidence from the person's prior behavior that the person has committed overt acts which caused harm or which directly threatened harm." H.R.Rep. No.

711, 100th Cong. 2d Sess. 5, *reprinted in* 1988 U.S.Code Cong. & Admin.News 2173, 2190 ("House Report"). The landlord's determination must not rest on "unsubstantiated inferences." *See id.* at 2191. In my view, there is no *objective* evidence concerning threatened harm that justified rejecting Cason, Roe and Doe.

The court is sympathetic to the Authority's desire not to rent public housing to persons with objectively dangerous tendencies. Nevertheless, defendants have produced no evidence that the challenged practices allow the Authority to screen out potentially dangerous tenants, nor have they shown the court that less intrusive means of investigating applicants, such as requests for landlord references, would be ineffective in achieving the desired ends.

Presumably, in renting to a non-handicapped person, the Authority takes a similar, and perhaps in some cases a greater, risk that some harm will come to the property or to other tenants. Yet such applicants' ability to live independently is never questioned, and they are not required to disclose their medical history. It would thus seem that the authority is content to rely upon information of a less intrusive and personal nature to assess the threat posed by these non-handicapped tenants. Without any objective evidence to indicate otherwise, it appears that the difference in treatment of the handicapped stems from unsubstantiated prejudices and fears regarding those with mental and physical disabilities. This is precisely the sort of situation that the fair housing laws were designed to prohibit.

■ Another factor relevant to a Fair Housing Act challenge is whether there exists evidence of discriminatory intent. Plaintiffs here, to the extent they base their position on a showing of adverse impact, offer no evidence of intent. This, however, is not fatal to their case. At least one court has recognized that the intent component is the least important under the test articulated in *Arlington Heights* and followed by this circuit in *Town of Huntington. See Baxter*, 720 F.Supp. at 732. Surely, evidence of discriminatory intent

would aid plaintiffs' position, but the absence of such proof weighs only slightly against granting relief.

The court in *Town of Huntington* followed *Arlington Heights* and ruled that the "balance should be struck more readily in favor of the plaintiff when it is seeking only to enjoin a municipal defendant from interfering with its own plans rather than attempting to compel the defendant itself to build housing." 844 F.2d at 940. Although the Second Circuit dealt with a challenge to a discriminatory zoning ordinance, its reasoning applies here as well. Plaintiffs seek not to compel the Authority to develop housing, but merely to change the procedure by which it selects tenants for its existing facilities.

### C. Regulatory Violations.

■ The Authority's practice of making inquiry into an applicant's ability to live independently is clearly at odds with the regulations promulgated by the United States Department of Housing and Urban Development ("HUD"). Part 24 of the Code of Federal Regulations (C.F.R.), at § 100.202(c), explicitly defines the permissible scope of inquiry allowed of a handicapped applicant for housing:

> (c) It shall be unlawful to make an inquiry to determine whether an applicant for a dwelling ... has a handicap or to make inquiry as to the nature or severity of a handicap of such a person. However, this paragraph does not prohibit the following inquiries, provided these inquiries are made of all applicants, whether or not they have handicaps:
> (1) Inquiry into an applicant's ability to meet the requirements of ownership or tenancy.

The remaining exceptions, which allow inquiries relating to specific types of housing, as well as those aimed at determining whether an applicant is a substance abuser or engages in other illegalities, are not at issue here.

The "requirements of tenancy" referred to above may be found at 24 C.F.R. § 966.4. This section details various lease requirements related to public housing, and

at subsection (f) lists 12 separate obligations that the lease may impose on tenants. Each concerns requirements that tenants not conduct themselves or treat the property in a manner that will interfere with other tenants' health, safety or enjoyment of the property. Tenants must, *inter alia,* avoid physical damage to the premises, keep them in a sanitary condition and comply with all applicable housing codes. Nowhere is there found a requirement that a resident be able to live "independently," rather than with the aid of others.[1]

Defendants do not deny that their conduct contravenes the current HUD regulations. Their position appears to be that because they annually send an outline of their procedures to HUD and that HUD has given at least tacit approval to those procedures that they are in compliance with HUD requirements.

■ It is clear, however, that the last "approval" of the Authority's policies was over two years ago, in 1988, and was apparently based on the 1987 HUD handbook. The applicable federal regulations that now control were promulgated *after* these dates. In any event, the prior approval by HUD cannot excuse the Authority from complying with all requirements of federal statutes and regulations concerning discrimination in housing. Clearly, the federal regulations cited above now control and the Authority must follow them.

C.F.R. Part 24, § 100.202(d), tracking the language of 42 U.S.C. § 3604(f)(9), does permit the Authority to refuse to rent a dwelling to one whose tenancy will pose a direct threat to the health and safety of others, or will result in physical damage to the property. There is no evidence in the record, however, to indicate that an *inability* to live independently creates the type of threat contemplated by the statute. *Cf. City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 450, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313 (1985) (concerns that allowing establishment of group home for re-

tarded citizens would physically endanger community were unfounded—similar concerns attached to locating apartment and fraternity houses in same location); *see also Association of Relatives and Friends of AIDS Patients v. Regulations and Permits Administration,* 740 F.Supp. 95 (D.P. R.1990) (No evidence that tenancy of 10 terminal AIDS patients carries significant threat to safety of community).

"Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion [from housing]." House Report, at 2179.

## D. Class Certification Motion.

■ Plaintiffs seek to certify this as a class action, with the class composed of

all individuals with handicaps, as defined by the Fair Housing Act and § 504 of the Rehabilitation Act, who have in the past three years applied for, are presently applying for or will in the future apply for, low income public housing administered by defendant Rochester Housing Authority.

Plaintiffs bear the burden of proving that this action meets the threshold requirements of Federal Rule of Civil Procedure 23(a), which provides, in full:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 2145, 40 L.Ed.2d 732 (1974).

---

**1.** The Authority complains that it lacks the staff and resources to provide support services to tenants. Plaintiffs, however, stress that they require nothing of the sort from the Authority; rather, many handicapped applicants receive

support from Medicaid or other assistance programs. A tenant who is able to meet the objective requirements of tenancy should not be denied housing simply because she receives medical assistance or other aid.

Plaintiffs also maintain that the class meets the requirements of Rule 23(b)(2). A class meets the requirements of this section if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

Defendants oppose certification on the grounds that (1) the class is not so numerous to make joinder impracticable; (2) plaintiffs are unable to finance the action (inadequate representation); (3) the named plaintiffs' lack standing; and (4) there are no common questions of fact.

These arguments against class certification lack merit. The complaint alleges a panoply of discriminatory acts relating to discrimination against the handicapped in addition to the denial of housing, therefore, all handicapped applicants in the relevant time period, of which there were approximately 276, and not just those who were denied housing, of which there were at least 17, are included in the class. Clearly, 276 plaintiffs cannot be practicably joined in the action.

Furthermore, I find defendant's challenge to the Monroe County Legal Assistance Corporation's ("MCLAC") ability to represent the class to be without basis. Plaintiffs' attorneys are well-regarded and experienced in this type of litigation. They routinely pursue class actions; in fact, MCLAC is presently engaged as counsel in class action litigation involving the Medicaid Act before this court. The named plaintiffs plainly will adequately represent the interests of the class.

Defendants claim that the plaintiffs have no "standing" because their claims predate the effective date of the Rehabilitation Act of 1988. Changes made to the Rehabilitation Act in 1988 are irrelevant to the issues in this case; the Act, passed in 1973, has always prohibited discrimination against handicapped individuals. Moreover, concerning the Fair Housing Act, some of the allegedly discriminatory actions were taken against each of the named plaintiffs after the effective dates of the 1988 amendments to the Fair Housing Act. Defendants also argue that even if there are common questions of law or fact among persons included in the class, individual questions predominate. Defendant, however, misconstrues the rule; predominance of common questions is only a requirement of subsection (b)(3), not (b)(2), under which plaintiffs seek certification. On the record before me, I find that common questions are present, and furthermore, that the claims of the named plaintiffs are typical of those of the members of the class.

Turning to the requirements of Rule 23(b)(2), it is beyond dispute that the actions allegedly taken by the Authority, including but not limited to living-independently standard and the requirement that all handicapped applicants sign medical releases, affect all members of the class. See Calkins v. Blum, 511 F.Supp. 1073 (N.D.N.Y.1981) (challenge to method of determining medicaid eligibility), aff'd on other grounds, 675 F.2d 44 (2d Cir.1982).

Moreover, I find that there exist so-called "additional reasons" for class certification under Rule 23(b)(2), as is required by courts in this circuit. See Calkins, 511 F.Supp. at 1089 (citing Davis v. Smith, 607 F.2d 535 (2d Cir.1979)). The "additional reasons" requirement stems from the notion that injunctive relief often by its nature inures to the benefit of similarly situated persons, without the need for formal class certification. As was noted in Calkins, however, courts generally do not merely assume that defendants will comply with the terms of the injunction on a class-wide basis, but instead will find "additional reasons" for certifying a class whenever defendants fail to make positive assurances regarding future compliance as to other class members. See Calkins, 511 F.Supp. at 1089; see also Rios v. Marshall, 100 F.R.D. 395, 412 (S.D.N.Y.1983) (where government defendants fail to represent intent to abide, as to all class members, by decision favoring named plaintiff, class certification guarantees enforceability of judgment).

For the reasons stated above, plaintiffs' motion for class certification is granted.

## CONCLUSION

Plaintiffs' motion for declaratory and injunctive relief is granted. The current procedures utilized by the Rochester Housing Authority to select tenants clearly violates federal law because the procedure has the effect of discriminating against handicapped applicants.

Specifically, that portion of the Authority's manual entitled "Standards for Tenant Selection Criteria" that requires an applicant to demonstrate an ability "to live independently" violates federal statutes and is contrary to federal regulations concerning discrimination in housing and must not be utilized in the tenant selection process. The Rochester Housing Authority is hereby enjoined from using this criteria in considering applications for housing. Furthermore, the Rochester Housing Authority is ordered to vacate the rejection of the applications of the three representative plaintiffs and those other members of the class that were denied housing on the basis of their inability to live independently and to immediately reconsider those applications under proper standards; and it is further

ORDERED that the Authority is to promulgate within sixty (60) days and obtain HUD approval for new standards for determining tenant eligibility that comply with all federal statutes and regulations that prohibit discrimination against the handicapped in housing.

IT IS SO ORDERED.